IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OHIO
EASTERN DIVISION


| | | |
|---|---|---|
| JEFFREY ALEXANDER PETREY, Sr. | ) | CASE NO. 1:20-CV-2028 |
| | ) | |
| Plaintiff, | ) | DISTRICT JUDGE PAMELA A. BARKER |
| | ) | |
| v. | ) | MAGISTRATE JUDGE |
| | ) | AMANDA M. KNAPP |
| COMMISSIONER OF SOCIAL | ) | |
| SECURITY ADMINISTRATION, | ) | |
| | ) | **REPORT AND RECOMMENDATION** |
| Defendant. | ) | |


Plaintiff Jeffrey Alexander Petrey, Sr. ("Plaintiff" or "Mr. Petrey") seeks judicial review

of the final decision of Defendant Commissioner of Social Security ("Commissioner") denying

his application for Disability Insurance Benefits ("DIB").  (ECF Doc. 1.)  This Court has

jurisdiction pursuant to 42 U.S.C. § 405(g).  This matter has been referred to the undersigned

Magistrate Judge for a Report and Recommendation pursuant to Local Rule 72.2.

For the reasons set forth below, the undersigned recommends that the final decision of

the Commissioner be AFFIRMED.

### I.  Procedural History

On February 27, 2018, Mr. Petrey filed an application for DIB, SSI and POD.  (Tr. 181.)

He alleged a disability onset date of October 18, 2016.  (Tr. 80.)  In his application, he alleged

disability due to: asthma; high blood pressure; and foot, ankle, right leg, lower back, both hand,

1

elbow, and shoulder problems.  (*Id*.)  Mr. Petrey's application was denied at the initial level (Tr.

75-94), and upon reconsideration (Tr. 96-111), and he requested a hearing (Tr. 126-27).  On

August 16, 2019, a hearing was held before an Administrative Law Judge ("ALJ").  (Tr. 43-78.)

On September 4, 2019, the ALJ issued a decision finding Mr. Petrey had not been under a

disability within the meaning of the Social Security Act from October 18, 2016 through the date

of the decision.  (Tr. 24-37.)  On July 8, 2020, the Appeals Council denied Mr. Petrey's request

for review, making the ALJ's decision the final decision of the Commissioner.  (Tr. 1-6.)  On

September 9, 2020, Mr. Petrey filed a Complaint challenging the Commissioner's final decision.

(ECF Doc. 1.)  The parties have completed briefing in the case.  (ECF Docs. 15, 17, 18.)

## II. Evidence

### A.    Personal, Educational, and Vocational Evidence

Mr. Petrey was born in 1966, and was 50 years old on the alleged disability onset date,

making him an individual closely approaching advanced age under Social Security Regulations

at all relevant times.  (Tr. 35.)  He had a limited education, and was able to communicate in

English.  (Tr. 36.)  He had not worked since October 18, 2016, the alleged onset date.  (Tr. 26.)

### B.    Medical Evidence

#### 1.    Treatment History

On May 20, 2015, Mr. Petrey established care at ACMC Physicians for treatment of

asthma, hypertension, and bilateral elbow pain.  (Tr. 282.)  He reported that his asthma was

under control with medication, but he had not taken his hypertension medication for a year, and

his elbow pain was worse with activity.  (*Id*.)  He had not tried anti-inflammatory medications.

(*Id*.)  On examination, Pazhaniaandi Tirounilacandin, M.D. noted tenderness in the medial and

lateral epicondylar region of Mr. Petrey's elbows, but observed no effusion, swelling or redness

of the overlaying skin.  (Tr. 282, 284.)  All other examination results were in the normal range.
(Tr. 484.)  Dr. Tirounilacandin prescribed Lisinopril for hypertension, meloxicam and
methylprednisolone for his elbow pain, and ordered x-rays of his elbows.  (Tr. 288.)

X-rays of Mr. Petrey's right elbow, taken the same day, revealed mild degenerative
arthrosis of the radiocapitellar, ulnatrochlear, and proximal radioulnar articulations with small
osteophytes.  (Tr. 299.)  X-rays of his left elbow revealed moderate degenerative arthrosis of the
radiocapitellar, ulnatrochlear, and proximal radioulnar articulations with small osteophytes.  (*Id*.)

On July 13, 2015, Mr. Petrey returned to Dr. Tirounilacandin, and reported his elbow
pain had restarted two or three weeks prior.  (Tr. 303.)  On examination, all findings were in the
normal range, including no edema or tenderness in Mr. Petrey's extremities.  (Tr. 310.)  Dr.
Tirounilacandin continued Mr. Petrey's medications and recommended that he return if his
symptoms worsened or failed to improve.  (Tr. 311.)

Mr. Petrey next sought care from Dr. Tirounilacandin on January 29, 2016, for treatment
of an acute asthma exacerbation with wheezing and a cough.  (Tr. 317.)  On examination, Dr.
Tirounilacandin noted moderate nasal congestion, moderate and turbinate hypertrophy, and mild
erythema.  (Tr. 322.)  He restarted Lisinopril for Mr. Petrey's hypertension, and theophylline, an
albuterol inhaler, and prednisone for the acute exacerbation of asthma.  (Tr. 323.)

On March 18, 2016, Mr. Petrey returned to Dr. Tirounilacandin for a follow-up
appointment.  (Tr. 327.)  Dr. Tirounilacandin noted Mr. Petrey's asthma was very well
controlled, and he was using medications regularly without side effects.  (*Id*.)  He also noted Mr.
Petrey reported he had been drinking for the past two or three days.  (*Id*.)  Examination results
were all in the normal range, except Dr. Tirounilacandin noted Mr. Petrey smelled of alcohol.
(Tr. 335.)  He requested Mr. Petrey return by May 1 to check on his hypertension.  (Tr. 336.)

At Mr. Petrey's next appointment on June 2, 2016, Dr. Tirounilacandin noted that his hypertension was not very well controlled.  (Tr. 346.)  Mr. Petrey reported that he had again stopped taking his medication about two weeks prior because it made him feel dizzy and lightheaded.  (*Id*.)  He also reported symptoms consistent with allergic rhinitis, and a recent citation for driving under the influence which might lead to jail time.  (*Id*.)  All examination results were within normal limits.  (Tr. 351.)  Dr. Tirounilacandin switched his hypertension medication to amlodipine, and prescribed Loratadine for allergies.  (*Id*.)  He requested Mr. Petrey return by July 1 to follow up on his hypertension.  (Tr. 352.)

Mr. Petrey returned on September 23, 2016, for the follow up appointment.  (Tr. 356.)  Dr. Tirounilacandin noted Mr. Petrey's asthma, hypertension, and allergic rhinitis were very well controlled, and laboratory workup revealed elevated liver enzymes.  (*Id*.)  On examination, all findings were in the normal range.  (Tr. 361.)  Dr. Tirounilacandin ordered bloodwork to measure Mr. Petrey's hepatic function.  (*Id*.)

On January 16, 2017, Mr. Petrey had another follow-up appointment.  (Tr. 366.)  Dr. Tirounilacandin noted Mr. Petrey's hypertension was again uncontrolled, and Mr. Petrey reported sometimes missing doses of his medication.  (*Id*.)  His asthma and allergic rhinitis remained well controlled.  (*Id*.)  Dr. Tirounilacandin noted examination results in the normal range, and recommended aerobic exercise and home blood pressure monitoring, as well as an increased dosage of amlodipine to help control Mr. Petrey's hypertension.  (Tr. 371.)

On August 9, 2017, Mr. Petrey returned to Dr. Tirounilacandin and reported numbness and tingling at multiple parts of his body over the prior two months, during which he had been in the habit of drinking heavy alcohol.  (Tr. 378.)  Dr. Tirounilacandin noted Mr. Petrey's hypertension remained poorly controlled, and he reported "no wish to quit" his heavy drinking.

(*Id.*)  Physical examination results were in the normal range.  (Tr. 383.)  Dr. Tirounilacandin again recommended aerobic exercise and home blood pressure monitoring to help control Mr. Petrey's hypertension.  (Tr. 383.)

On December 26, 2017, Dr. Tirounilacandin noted that Mr. Petrey's hypertension, allergies and asthma were all very well controlled, and he was no longer experiencing numbness, tingling, or weakness.  (Tr. 391.)  He again recommended regular aerobic exercise and home blood pressure monitoring.  (Tr. 396.)

On December 27, 2017, Mr. Petrey underwent a comprehensive assessment at Lake Area Recovery Center and reported breathing issues that "create[d] problems" in how he dealt with life.  (Tr. 432.)  Assessor Christen Sonoski noted he was referred for services secondary to testing positive on a drug screening, which was a violation of probation.  (Tr. 433.)  He was originally placed on probation as a result of his sixth OVI charge about a year prior.  (*Id.*)  He described his interests as fishing, hunting, and reading about history and current events.  (Tr. 434.)  He was diagnosed with alcohol use disorder, severe.  (Tr. 441.)

Mr. Petrey was successfully discharged from the Lake Area Recovery Center program on March 26, 2018.  (Tr. 443.)  He was referred to a stepstone IOP group, from which he was involuntarily discharged in November 2018 for nonparticipation.  (Tr. 446.)

On September 17, 2018, Mr. Petrey treated with Dr. Tirounilacandin for coughing, phlegm, and wheezing, which had begun a week earlier.  (Tr. 459.)  Dr. Tirounilacandin noted his hypertension, and allergies were very well controlled.  (*Id.*)  Examination revealed congestion, turbinate hypertrophy, nasal discharge, and wheezing in his lungs.  (Tr. 462.)  Dr. Tirounilacandin assessed asthmatic bronchitis, moderate persistent, with acute exacerbation, and

prescribed an albuterol inhaler, doxycycline hyclate, and methylprednisone.  (Tr. 462.)  He also recommended aerobic exercise and home blood pressure monitoring for hypertension.  (*Id*.)

Mr. Petrey was treated by Yisa Sunmonu, M.D., at ACMC Sleep Disorders Center on October 10, 2018, after referral due to worsening shortness of breath.  (Tr. 469.)  Spirometry revealed moderate obstruction suggestive of chronic airway disease and prominence of interstitial markings secondary to chronic bronchitis.  (Tr. 469-70.)  He also reported chronic back pain.  (Tr. 470.)  Examination revealed occasional tremulousness.  (Tr. 471.)  Dr. Sunmonu assessed shortness of breath with suspected COPD, simple chronic bronchitis, hypersomnia, chronic fatigue, and mild obesity, and recommended additional testing.  (*Id*.)

Mr. Petrey continued treatment at ACMC Sleep Disorders Center from October 2018 through 2019.  (Tr. 499-518, 535-45, 572-77.)  A PFT report from testing performed in October 2018 supported a diagnosis of severe obstructive airways disease, asthmatic type.  (Tr. 517.)  An overnight polysomnogram performed in December 2019 supported a diagnosis of hypersomnia, and Dr. Sunmonu recommended sleep hygiene counseling, weight loss, and avoidance of alcohol, caffeine, or nicotine.  (Tr. 513.)  An overnight polysomnogram performed in April 2019 supported a diagnosis of obstructive sleep apnea, and Dr. Sunmonu recommended CPAP therapy, and avoidance of alcohol, caffeine, or nicotine.  (Tr. 507.)  An overnight polysomnogram performed in June 2019 supported a diagnosis of obstructive sleep apnea, controlled with CPAP usage.  (Tr. 500.)

On November 7, 2018, Mr. Petrey returned to Dr. Tirounilacandin for a follow-up appointment and complained of right hip pain that was stabbing and sometimes radiated into his lower leg, that had been present for the past couple of months and was worsening.  (Tr. 522.)  He reported he had not tried treating the pain with over-the-counter medications.  (*Id*.)  Mr. Petrey

also reported chronic joint pain that had been present for many years, for which he had never

seen a rheumatologist.  (*Id*.)  Dr. Tirounilacandin noted his hypertension was poorly controlled.

(*Id*.)  Examination results were in the normal range except for tenderness in the trochanter region

of the right elbow, with a good range of motion.  (Tr. 524.)  Dr. Tirounilacandin increased Mr.

Petrey's dosage of Lisinopril, recommended regular aerobic exercise and home blood pressure

monitoring, and referred Mr. Petrey to a rheumatologist.  (Tr. 524-25.)

On February 26, 2019, Mr. Petrey treated with Brandon Raudenbush, DO in the

Ashtebula County Medical Center department of orthopedic and spine surgery regarding his right

hip and leg pain.  (Tr. 546.)  He reported that his pain had been chronic "on and off" for years

and extended throughout his body, and he had not seen a rheumatologist despite his doctor's

recommendation that he do so.  (*Id*.)  On examination, Dr. Raudenbush noted Mr. Petrey's "gait

is exaggerated at times, but this appears to be slightly antalgic," he had tenderness over the

greater trochanter and along the iliotibial band of the right hip down to the knee and around the

IT band at the knee, tenderness to palpation over the greater trochanter, equivocal pain with

passive flexion and internal and external rotation, and reduced range of motion due to body

habitus and large central obesity.  (Tr. 549.)  He also noted full range of motion and full strength

of the hip, knee, and ankle with significant pain in every single joint.  (*Id*.)  The distal neurologic

exam was within normal limits.  (*Id*.)  Dr. Raudenbush noted that x-rays of Mr. Petrey's hips

from November 2018 revealed mild degenerative changes to both hips.  (*Id*.)  Dr. Raudenbush

told Mr. Petrey that the issue could be osteoarthritis, but recommended Mr. Petrey treat first with

a rheumatologist so that arthritis should be ruled out.  (Tr. 551-52.)  Dr. Raudenbush also

recommended physical therapy, and offered to treat with injections if that did not alleviate his

pain.  (Tr. 552.)

On March 11, 2019, Mr. Petrey was evaluated for physical therapy with Jennifer Diehl, PT regarding his left hip, lower back, and multiple joint pain. (Tr. 559.) He reported difficulty sitting, standing, walking, bending, lifting, and squatting, and explained he struggled to shower because he could not stand for fifteen or twenty minutes, and was considering getting a shower chair. (*Id*.) He reported walking on uneven ground was very difficult, but he did not use a cane or walker. (*Id*.) On examination, Ms. Diehl noted that he shifted off his right leg when sitting and standing, and exhibited tenderness in his buttock and down his right lateral leg and lateral knee with reduced range of motion with hip movements. (Tr. 560.) He also exhibited reduced 4/5 strength with hip flexion, abduction, and knee extension on the left, 3+/5 strength with hip flexion and abduction on the right, and 4-/5 strength with knee extension on the right. (*Id*.) The functional strength evaluation noted that Mr. Petrey could not alternate on stairs, could partially squat with pain, and needed to use his upper extremities to move from sitting to standing. (Tr. 561.) Examination results also included a positive straight leg raise on the right with radicular pain, pain in the back, extreme leg pain, a positive Faber's test, a Trendelenburg gait with weight. (*Id*.) Ms. Diehl recommended physical therapy to work on range of motion, strengthening, and reducing Mr. Petrey's tightness and pain. (*Id*.) She noted he had never had physical therapy in the past, and expressed concerns about compliance because he declined to schedule additional appointments. (*Id*.) Ms. Diehl opined that his rehab potential was poor due to a prior history of unwillingness to work with rheumatology. (Tr. 562.)

On May 29, 2019, Mr. Petrey treated with podiatrist Jessica Milliman, DPM, regarding his foot and right ankle pain. (Tr. 483.) He reported foot pain and tenderness with walking. (*Id*.) On examination, Dr. Milliman noted full strength in all major muscle groups tested in the bilateral lower extremities, decreased range of motion in the ankle joint with dorsiflexion with

the knee extended and flexed, pain to palpation in the medial calcaneal tubercle, mild pain along

the medial band of the plantar fascia, and right sided pain with ankle joint range of motion.  (Tr.

484.)  Dr. Milliman assessed him with leg and foot pain, ankle arthritis, equinus deformity of

both feet, and bilateral plantar fasciitis.  (*Id*.)  She offered to treat his pain with an injection, and

he declined.  (*Id*.)  Dr. Milliman recommended supportive shoe gear and prescribed physical

therapy and ibuprofen.  (Tr. 485.)

### 2.     Opinion Evidence

#### i.     Consultative Examinations

Mr. Petrey underwent a consultative psychological evaluation with Bryan Krabbe, Psy.D.

on June 14, 2018. (Tr. 404-11.)  He reported having completed tenth grade, after repeating

seventh grade  and receiving mostly B and C grades in school.  (Tr. 405.)  Dr. Krabbe noted he

was punctual and cooperative with adequate grooming and hygiene, and adequate energy.  (Tr.

407.)  He opined Mr. Petrey put forth good effort towards completing tasks, and did not

exaggerate or minimize his difficulties.  (*Id*.)  His speech and thought processes were within

normal limits.  (*Id*.)  His mood appeared to be irritable, as he scowled, but he manifested no

indication of anger or hostility.  (*Id*.)  He scored a full-scale IQ of 89 on the Wechsler Adult

Intelligence Scale – IV, which is in the low average range.  (Tr. 408.)  Dr. Krabbe assessed that

Mr. Petrey's memory skills using the Weschler Memory Scale, and determined they were in the

average range.  (Tr. 409.)  Dr. Krabbe opined that Mr. Petrey's remote recall and short-term

memory skills were adequate, his attention and concentration skills were satisfactory, and his

intellectual functioning was low average to average.  (Tr. 410.)  Dr. Krabbe opined that Mr.

Petrey's irritability "may affect level of engagement with co-workers and supervisors," and his

symptoms of depression "may compromise his ability to respond to work pressures leading to increased emotional instability and withdrawl."  (Tr. 411.)

Mr. Petrey also underwent a consultative internal medicine examination with Khalid Darr, M.D. on July 11, 2018.  (Tr. 413-16.)  Mr. Petrey reported that he suffered from wheezing and shortness of breath for which he underwent a pulmonary function test and was told he had COPD.  (Tr. 413.)  He said he could walk a block on a level surface without experiencing shortness of breath, but had to stop at least twice while going up a flight of stairs.  (*Id*.)  He also reported pain in his left shoulder and right ankle area for the past few months, which would come and go.  (*Id*.)  On examination, Dr. Darr noted rales and expiratory wheezes bilaterally in his lungs.  (Tr. 414.)  Both his left shoulder and right ankle had a normal range of motion, his gait was normal, and he appeared comfortable in the supine and sitting positions.  (*Id*.)  X-rays ordered by Dr. Darr showed mild to moderate degenerative changes and joint space narrowing in Mr. Petrey's right ankle, and mild widening of the acromioclavicular joint in his left shoulder. (Tr. 429.)  Mr. Petrey was not noted to be short of breath with exertion or when lying flat during the exam, and had full strength in both his upper and lower extremities, with no evidence of atrophy.  (Tr. 415.)  However, Mr. Petrey's pulmonary function test revealed "severe COPD and Moderate Restrictive with improvement after bronchodilator."  (Tr. 428.)  Dr. Darr opined that Mr. Petrey will have a hard time climbing stairs, and could lift and carry between ten and fifteen pounds on a frequent basis and over fifteen pounds occasionally.  (Tr. 416.)

### ii.        State Agency Reviewers

On June 21, 2018, state agency reviewing psychologist Irma Johnston, Psy.D., reviewed the record and opined that Mr. Petrey's reported heavy alcohol use may impair his ability to

work, but he had no more than mild limitations in all areas of mental residual functional capacity ("RFC").  (Tr. 87-88.)

On July 23, 2018, state agency reviewing physician Bradley Lewis, M.D., reviewed the record and opined that Mr. Petrey had the following limitations to his physical RFC:

- Occasionally lift and/or carry 20 pounds;

- Frequently lift and/or carry 10 pounds;

- Sit about 6 hours in an 8-hour workday;

- Stand and/or walk about 6 hours in an 8-hour workday;

- Frequently climb ramps and stairs;

- Occasionally climb ladders, ropes, and scaffolds;

- Frequently stoop, crouch and crawl; and

- Avoid concentrated exposure to extreme cold, humidity, fumes, odors, dusts, gasses, and poor ventilation.

(Tr. 90-92.)

On December 4, 2018, state agency reviewing psychologist Cynthia Waggoner, Psy.D., reviewed the record and concurred with the opinion of Dr. Johnston.  (Tr. 104.)

Also on December 4, 2018, state agency reviewing physician Abraham Mikalov, M.D., reviewed the record and concurred with the opinion of Dr. Lewis.  (Tr. 106-08.)

**C.     Hearing Testimony**

**1.     Plaintiff's Testimony**

At his August 16, 2019 hearing, Mr. Petrey testified that he lived with his wife and sixteen-year-old daughter.  (Tr. 47.)  He had an older son and daughter who did not live with him.  (Tr. 66.)  He did not work, volunteer, or do any odd jobs.  (Tr. 49.)  The only household income was earned by his wife, who worked two jobs.  (*Id*.)  He contributed around the house by

11

running the vacuum a few times, doing the dishes about every other day, and cutting the lawn a few times a year using a riding mower.  (Tr. 64.)  He last mowed the lawn about ten days prior, and could not walk for almost three days after that.  (*Id*.)  He also did his own laundry, and simple cooking.  (*Id*.)  His daughter was a young adult, and he did not provide care for her.  (Tr. 65.)  She drove and worked for herself, as well as being in school and playing volleyball.  (*Id*.)  He could not even go to some of her sporting events, because he could not walk.  (*Id*.)

On a typical morning, he got up, showered, brushed his teeth, got dressed, took care of the bed, and let the dogs out.  (Tr. 65.)  Sometimes he would go out onto the porch to watch the dogs.  (*Id*.)  Then he took his medicine, checked out the news, tried to read, and waited for his family to get done with their day.  (*Id*.)  His wife mostly worked from home, but he could not interrupt her until she was done.  (Tr. 66.)  He had not read a book in over two years.  (*Id*.)  He only took car trips when he needed to get somewhere.  (*Id*.)

He completed tenth grade.  (Tr. 47.)  He got into trouble as a teenager, and was sent to a group home in Pennsylvania.  (Tr. 48.)  He did not go back to school or try to get a GED.  (*Id*.)

He last worked in October 2016, through a temp agency.  (Tr. 50.)  He was a press operator at a fiberglass molding business.  (*Id*.)  He weighed, cut, and pressed fiberglass, before handing it off to a finisher.  (Tr. 51-52.)  He operated the press, but did not set it up.  (Tr. 53.)  He had to stand the whole time he was working, and sometimes had to step up two or three steps to reach the press.  (*Id*.)  He had to lift and carry up to forty pounds.  (Tr. 54.)  Prior to that, he worked at a chemical processing company, cleaning tanks used in production, filling the tanks, and mixing the contents.  (Tr. 54-55.)  He had to be constantly on his feet, and carry up to eighty pounds.  (Tr. 56.)  Before that, he worked in the shipping and receiving department at a company that manufactured roofing and waterproofing materials.  (Tr. 57.)  He would unload trucks, clear

areas for new freight, and rotate stock.  (Tr. 57-58.)  Over his years there, he moved up to a supervisory role, but did not have authority to hire or fire workers.  (Tr. 58.)  In that job, he lifted and carried rolls of roofing weighing between 50 and 125 pounds.   (Tr. 59.)

He stopped working because he was having severe problems with his feet, requiring him to take twelve to fourteen aspirin to get through a shift.  (Tr. 53.)  He also was having problems with his hands and writing.  (*Id*.)  He reported the pain in his feet, arms and neck is constant.  (Tr. 60, 67.)  He had numbness, tingling, and burning in his feet, arms and hip.  (Tr. 68.)  It felt like someone was driving spikes into his feet.  (Tr. 67.)  None of the treatments he tried worked.  (Tr. 61.)  He got worn out taking a shower, and his shoulders and arms burned when he raised them to wash his hair.  (Tr. 61.)  His arms and hands trembled when he tried to lift a water jug or write.  (Tr. 67.)  He had to constantly adjust between sitting, standing, and walking.  (*Id*.)

His lungs were clear, but he had a rescue inhaler that was his "lifeline."  (Tr. 69.)  He also had a maintenance inhaler and a nebulizer that he used a few times a week.  (Tr. 70.)  His doctor found a new nodule in his lung on July 5, and he had to go back in October to check if it has grown.  (Tr. 69.)

He was incarcerated for thirty days in 2017, and probably three other times before that.  (Tr. 62.)  He used to have a drinking problem, but at the time of the hearing he reported that he only drank about four beers in a sitting every three to four days.  (Tr. 63.)  He did not have a valid driver's license, after losing his license about six years prior as a result of an OVI.  (Tr. 49.)

###### 2.      Vocational Expert's Testimony

A Vocational Expert ("VE") testified at the hearing, and classified Mr. Petrey's past work as that of a tank cleaner, press operator, and shipping and receiving clerk.  (Tr. 73.)

13

For his first hypothetical, the ALJ asked the VE to assume an individual of Mr. Petrey's

age and education and with his past work, with the following functional limitations:

> He, or she, can frequently climb ramps and stairs; occasionally climb ladders, ropes, and scaffolds; frequently stoop, crouch, and crawl.  This individual should only be frequently exposed to extreme cold, humidity, fumes, odors, dust, gases, and poor ventilation.

(Tr. 73.)

The VE testified that the hypothetical individual would be able to perform any of Mr.

Petrey's past work as a press operator as it is classified, at the light exertion level, but not as he

previously performed it, at the medium exertion level.  (Tr. 74.)  The VE further testified that the

hypothetical individual could perform representative positions in the national economy,

including cashier, sales attendant, or packing line worker.  (*Id*.)

Mr. Petrey's counsel asked whether an employee who was limited to lifting ten to fifteen

pounds frequently, and fifteen pounds occasionally could do the jobs the VE identified.  (Tr. 75.)

The VE testified this restriction would result in "a default to sedentary residual functional

capacity," and therefore exclude the jobs he cited, which are all at the light exertional level.  (*Id*.)

Mr. Petrey's counsel then amended the hypothetical to add the limitation that the

employee is able to occasionally reach with the right dominant upper extremity, and frequently

reach with the left upper extremity in all directions.  (Tr. 76.)  The VE testified that, based on his

experience, this would also eliminate the jobs he cited, but other jobs would be available.  (*Id*.)

Mr. Petrey's counsel next amended the original hypothetical to add the limitation that the

employee is able to stand and walk for three hours and sit for six hours out of an eight-hour

workday.  (Tr. 76.)  The VE testified this would eliminate all light work, including the jobs he

cited.  (*Id*.)  Finally, the VE testified that a person could be off task no more than ten percent of

the time and could be absent no more than once a month to maintain employment.  (Tr. 76-77.)

14

### III. Standard for Disability

Under the Social Security Act, 42 U.S.C § 423(a), eligibility for benefit payments depends on the existence of a disability.  "Disability" is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months."  42 U.S.C. § 423(d)(1)(A). Furthermore:

> [A]n individual shall be determined to be under a disability only if his physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy . . . .

42 U.S.C. § 423(d)(2).

To make a determination of disability under this definition, an ALJ is required to follow a five-step sequential analysis set out in agency regulations.  The five steps can be summarized as follows:

1.   If the claimant is doing substantial gainful activity, he is not disabled.

2.   If the claimant is not doing substantial gainful activity, his impairment must be severe before he can be found to be disabled.

3.   If the claimant is not doing substantial gainful activity, is suffering from a severe impairment that has lasted or is expected to last for a continuous period of at least twelve months, and his impairment meets or equals a listed impairment, the claimant is presumed disabled without further inquiry.

4.   If the impairment does not meet or equal a listed impairment, the ALJ must assess the claimant's residual functional capacity and use it to determine if the claimant's impairment prevents him from doing past relevant work.  If the claimant's impairment does not prevent him from doing his past relevant work, he is not disabled.

5.   If the claimant is unable to perform past relevant work, he is not disabled if, based on his vocational factors and residual functional capacity, he is

15

capable of performing other work that exists in significant numbers in the national economy.

20 C.F.R. § 404.1520;[1]  *see also Bowen v. Yuckert*, 482 U.S. 137, 140-42, 96 L. Ed. 2d 119, 107 S. Ct. 2287 (1987).  Under this sequential analysis, the claimant has the burden of proof at Steps One through Four.  *Walters v. Comm'r of Soc. Sec.*, 127 F.3d 525, 529 (6th Cir. 1997).  The burden shifts to the Commissioner at Step Five to establish whether the claimant has the Residual Functional Capacity ("RFC") and vocational factors to perform other work available in the national economy.  *Id.*

### IV. The ALJ's Decision

In her September 4, 2019 decision, the ALJ made the following findings:[2]

1.  The claimant meets the insured status requirements of the Social Security Act through December 31, 2020.

2.  The claimant has not engaged in substantial gainful activity since October 18, 2016, the alleged onset date.

3.  The claimant has the following severe impairments: dysfunction of major joints; chronic obstructive pulmonary disease (COPD); and obesity.

4.  The claimant does not have an impairment or combination of impairments that meets or medically equals the severity of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1.

5.  The claimant has the residual functional capacity to perform light work as defined in 20 CFR 404.1567(b) except: frequently climb ramps and stairs; occasionally climb ladders, ropes or scaffolds; frequently stoop, crouch and crawl; frequent exposure to extreme cold, humidity, fumes, odors, dusts, gases, and poor ventilation.

---

[1] The DIB and SSI regulations cited herein are generally identical.  Accordingly, for convenience, in most instances, citations to the DIB and SSI regulations regarding disability determinations will be made to the DIB regulations found at 20 C.F.R. § 404.1501 et seq.  The analogous SSI regulations are found at 20 C.F.R. § 416.901 *et seq*., corresponding to the last two digits of the DIB cite (*i.e.*, 20 C.F.R. § 404.1520 corresponds with 20 C.F.R. § 416.920).

[2] The ALJ's findings are summarized.

6.      The claimant is capable of performing past relevant work as a Press Operator. This work does not require the performance of work-related activities precluded by the claimant's residual functional capacity.

(Tr. 26-37.)

Based on the foregoing, the ALJ determined that Mr. Petrey had not been under a disability, as defined in the Social Security Act, from October 18, 2016, through the date of the decision on September 4, 2019.  (Tr. 37.)

## V. Plaintiff's Arguments

Mr. Petrey asserts that the ALJ's RFC determination is not supported by substantial evidence because she failed to properly evaluate the opinion of consulting examiner Dr. Khalid Darr.  (ECF Doc. 15, p. 3.)

## VI. Law & Analysis

### A.      Standard of Review

A reviewing court must affirm the Commissioner's conclusions unless it determines that the Commissioner has failed to apply the correct legal standards or has made findings of fact unsupported by substantial evidence in the record.  42 U.S.C. § 405(g); *Wright v. Massanari*, 321 F.3d 611, 614 (6th Cir. 2003).  "Substantial evidence is more than a scintilla of evidence but less than a preponderance and is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Besaw v. Sec'y of Health & Human Servs.*, 966 F.2d 1028, 1030 (6th Cir. 1992) (quoting *Brainard v. Sec'y of Health & Human Servs.*, 889 F.2d 679, 681 (6th Cir. 1989).  The Commissioner's findings "as to any fact if supported by substantial evidence shall be conclusive." *McClanahan v. Comm'r of Soc. Sec.*, 474 F.3d 830, 833 (6th Cir. 2006) (citing 42 U.S.C. § 405(g)).  Where, as here, the Appeals Council denies review, the decision of the ALJ becomes the final decision of the Commissioner.  *Friend v. Comm'r of Soc.*

*Sec.*, 375 F. App'x 543, 550 (6th Cir. 2010); *citing Osburn v. Apfel,* 182 F.3d 918 (table), 1999

WL 503528, at *4 (6th Cir. 1999).  In these cases, the Sixth Circuit has made clear that "we may

only review evidence that was available to the ALJ to determine whether substantial evidence

supported her decision."  *Id*.

       A court "may not try the case *de novo*, nor resolve conflicts in evidence, nor decide

questions of credibility."  *Garner v. Heckler*, 745 F.2d 383, 387 (6th Cir. 1984).  Even if

substantial evidence or a preponderance of the evidence supports a claimant's position, a

reviewing court cannot overturn the Commissioner's decision "so long as substantial evidence

also supports the conclusion reached by the ALJ."  *Jones v. Comm'r of Soc. Sec.*, 336 F.3d 469,

477 (6th Cir. 2003).  To assess whether substantial evidence supports the ALJ's decision, a court

may consider evidence not referenced by the ALJ.  *Heston v. Comm'r of Soc. Sec.*, 245 F.3d 528,

535 (6th Cir. 2001).

**B.       Whether ALJ Erred in Evaluating Opinion of Consultative Examiner Dr. Darr**

       Mr. Petrey's sole assignment of error is that the ALJ failed to properly evaluate the

opinion of consulting examiner Khalid Darr, M.D.  (ECF Doc. 15, pp. 9-10.)  He argues that the

"ALJ's rejection of Dr. Darr's opinion is entirely based on her perceived observation that there

existed a lack of evidence regarding Plaintiff's pain" and a presumption that "Dr. Darr's opinion

was based upon Plaintiff's back, arm, and leg pain."  (*Id*., p. 11.)  In finding no support for Dr.

Darr's specific lifting and carrying limitations, Mr. Petrey contends that the ALJ "failed to

acknowledge that Dr. Darr's opinion was based, not only on his findings related to Plaintiff's

gait and lack of tenderness, but on Plaintiff's pulmonary limitations."  (*Id*.)  He also argues the

medical evidence is consistent with Dr. Darr's opinion regarding lifting and carrying, and cites to

other findings relating to Mr. Petrey's pulmonary impairments in support of this argument.  (*Id*.,

p. 12.)  Finally, he contends that the failure to properly evaluate the pulmonary evidence was

18

harmful because the lifting and carrying limitations in Dr. Darr's opinion would have limited Mr. Petrey to sedentary work, leading to a finding of disability if adopted.  (*Id.*)

The Commissioner responds that the ALJ appropriately considered all relevant evidence, including evidence related to Mr. Petrey's pulmonary issues, and that substantial evidence supports the ALJ's determination that Mr. Petrey was not disabled because he could perform a reduced range of light work despite his physical limitations.  (ECF Doc. 17, p. 4.)

### 1. Regulations Governing Evaluation of Opinion Evidence

Since Mr. Petrey's claim was filed after March 27, 2017, the Social Security Administration's ("SSA") new regulations for evaluation of medical opinion evidence apply to his claim. *See Revisions to Rules Regarding the Evaluation of Medical Evidence (Revisions to Rules),* 2017 WL 168819, 82 Fed. Reg. 5844 (Jan. 18, 2017); 20 C.F.R. § 416.920c. The five categories of evidence to be considered under these regulations include: (1) objective medical evidence; (2) medical opinions; (3) other medical evidence; (4) evidence from non-medical sources; and (5) prior administrative medical findings. 20 C.F.R. § 416.913(a)(1)-(5).

The regulations specify that SSA "will not defer or give any specific evidentiary weight, including controlling weight, to any medical opinion(s) or prior administrative medical finding(s), including those from [a claimant's] medical sources." 20 C.F.R. § 416.920c(a). Distinct from a prior framework that gave more weight to opinions from treating sources, the new regulations provide that "administrative law judges will now evaluate the 'persuasiveness' of medical opinions by utilizing the five factors listed in paragraphs (c)(1) through (c)(5) of the regulation."  *Jones v. Comm'r of Soc. Sec.*, No. 3:19-CV-01102, 2020 WL 1703735, at *2 (N.D. Ohio Apr. 8, 2020) (*quoting Gower v. Saul*, 2020 WL 1151069, at * 4 (W.D. Ky, March 9, 2020) (*citing* 20 C.F.R. § 404.1520c(a) and (b)); *see also Ryan L. F. v. Comm'r of Soc. Sec.*, No. 6:18-

CV-01958-BR, 2019 WL 6468560, at *4 (D. Or. Dec. 2, 2019) ("Although the regulations eliminate the 'physician hierarchy,' deference to specific medical opinions, and assigning 'weight' to a medical opinion, the ALJ must still 'articulate how [he/she] considered the medical opinions' and 'how persuasive [he/she] find[s] all of the medical opinions.'") (*citing* 20 C.F.R. §§ 404.1520c(a) and (b) (1), 416.920c(a) and (b) (1)) (alterations in original)).

The five factors to be evaluated are supportability, consistency, relationship with the claimant, specialization, and other factors, but supportability and consistency are acknowledged to be the most important factors for consideration. 20 C.F.R. § 416.920c(c)(1)-(5); 20 C.F.R. § 416.920c(b)(2). The regulations define "supportability" as follows: "The more relevant the objective medical evidence and supporting explanations presented by a medical source are to support his or her medical opinion(s) or prior administrative medical finding(s), the more persuasive the medical opinions or prior administrative medical finding(s) will be." 20 C.F.R. § 416.920c(c)(1). The regulations define "consistency" as follows: "The more consistent a medical opinion(s) or prior administrative medical finding(s) is with the evidence from other medical sources and nonmedical sources in the claim, the more persuasive the medical opinion(s) or prior administrative medical finding(s) will be." 20 C.F.R. § 416.920c(c)(2).

### 2. ALJ Explicitly Considered Dr. Darr's Pulmonary Consultative Examination Findings in Developing the RFC

In arguing that the ALJ erred, Mr. Petrey argues that the consultative examiner's opinion was based on findings regarding both pain and pulmonary impairments, and that the ALJ improperly presumed that the opinion was based on pain alone. (ECF Doc. 15, p. 11.) While it is indeed evident that Dr. Darr's examination findings addressed both physical pain and pulmonary impairments, it is also evident from the ALJ's written findings that she explicitly considered Dr. Darr's findings regarding both issues in crafting the RFC.

20

At the July 11, 2018 consultative examination, Dr. Darr found that Mr. Petrey had a normal gait, stable station, no difficulty with tandem gait or squatting, full strength and range of motion, well preserved sensory modalities, no tenderness in the spine or extremities, normal straight leg raise testing, was comfortable in the supine and sitting positions, and had intact upper extremity functions.  (Tr. 414-20.)  Dr. Darr also observed that his lung fields revealed bilateral rales and expiratory wheezing, but with symmetrical breath sounds, no accessory muscle recruitment, no chest tenderness, and no shortness of breath with exertion or when lying flat.  (Tr. 414-15.)  The technician who administered the pulmonary function test conducted on the same day noted Mr. Petrey demonstrated no breathing difficulty during the examination.  (Tr. 423.)  The pulmonary function test revealed "severe COPD and Moderate Restrictive with improvement after bronchodilator."  (Tr. 428.)  Dr. Darr diagnosed Mr. Petrey with COPD with bilateral rales and expiratory wheezing and "[p]ain, left shoulder and right ankle" with a normal range of motion on exam.  (Tr. 416.)

Based on his examination, Dr. Darr opined that Mr. Petrey had intact upper extremity functions, did not need an ambulatory aid, was able to push, pull, and manipulate objects and operate hand and foot control devices, was able to operate a motor vehicle and travel, and had intact activities of daily living and instrumental activities of daily living.  (Tr. 416.)  He identified only two functional limitations, specifically that Mr. Petrey "will have a hard time climbing stairs" and "is able to lift and carry between 10 and 15 pounds of weight on a frequent basis and over 15 pounds on occasion."  (Tr. 416.)

A review of the ALJ's discussion of Dr. Darr's findings clearly reflects that she considered his objective findings as to both pain and pulmonary limitations in assessing the

medical evidence and determining the RFC.  In discussing the evidence and RFC, she noted:

> As part of the claimant's application for benefits, he was evaluated by consultative examiner Khalid Darr, M.D., on July 11, 2018 (3F).  He complained of pain in his left shoulder and right ankle (3F/2).  He stated that the pain comes and goes and he has not sought any medical attention (3F/2).  Physical examination notes show that the claimant had a normal gait, normal range of motion, and no tenderness to palpation.
>
> …
>
> As mentioned above, on July 11, 2018, the claimant was evaluated by consultative examiner Dr. Darr (3F). He reported that he has smoked a pack and a half of cigarettes for 10 years before quitting 20 years ago (3F/2). He complained of wheezing and shortness of breath and he stated that he had a diagnosis of COPD (3F/2). The claimant stated that any kind of physical activity or change in weather, especially cold weather, will cause aggravation of his breathing issues (3F/2). He estimated that he can only walk one block on a level surface without getting short of breath and needs several breaks when walking up stairs (3F/2). A pulmonary examination shows that the claimant has rales and expiratory wheezing bilaterally (3F/3). Dr. Darr assessed the claimant as having COPD with bilateral rales and expiratory wheezing (3F/5).

(Tr. 31-33.)  These comments specific to Dr. Darr's examination were contained within the ALJ's discussion of the medical evidence as a whole, which also included a broad discussion of other evidence relating to the assessment and treatment Mr. Petrey's pulmonary impairments.

At the conclusion of her discussion of the evidentiary record, the ALJ concluded with respect to the pulmonary impairments:

> Considering the objective medical evidence, I find that the claimant would be limited in his ability to tolerate exposure to extreme cold, humidity, fumes, odors, dusts, gases and poor ventilation.

(Tr. 33.)  She then moved on to evaluate the opinion evidence, stating with respect to Dr. Darr's opinion in particular:

> I am somewhat persuaded by the opinion of consultative examiner Khalid Darr, M.D. (3F). On July 11, 2018, Dr. Darr opined that the claimant is able to push, pull, manipulate objects, and operate hand and foot control devices and his ability to reach, handle, and perform fine and gross movements were intact (3F). Dr. Darr also opined that the claimant would have a hard time climbing stairs and could lift

> and carry 10 - 15 pounds (3F). I am somewhat persuaded by this opinion, as the medical evidence supports the assertion that the claimant was able to perform all the above referenced manipulative and postural activities (1F; 9F). Specifically, the record shows that the claimant had normal range of motion, mild degeneration of his elbow, and no problems with his gait (1F; 9F). There is no support for Dr. Darr's assertion that the claimant would have a hard time lifting 10 – 15 pounds.

(Tr. 34.)

It is evident from the decision as a whole that the ALJ reviewed and considered all of Dr. Darr's examination findings, including those regarding pulmonary impairments, in crafting an RFC that contained explicit pulmonary limitations.  (Tr. 33.)  The Sixth Circuit has repeatedly explained that an ALJ need not "reproduce the list of these treatment records a second time when she explained why [an] opinion was inconsistent with this record."  *Crum v. Comm'r of Soc. Sec.*, 660 F. App'x 449, 457 (6th Cir. 2016); *citing Forrest v. Comm'r of Soc. Sec.*, 591 F. App'x 359, 366 (6th Cir. 2014); *Bledsoe v. Barnhart*, 165 F. App'x 408, 411 (6th Cir. 2006) (finding no need to require the ALJ to "spell out every fact a second time").  Although the ALJ did not specifically address Dr. Darr's pulmonary findings in the paragraph where she found his opinion somewhat persuasive, her prior discussion made it clear that his findings were considered in adopting environmental limitations in the RFC to address Mr. Petrey's pulmonary impairments.

Rather than arguing that the ALJ failed to consider Dr. Darr's pulmonary findings in crafting the RFC – which she clearly did – Mr. Petrey attempts to thread the needle by arguing more specifically that the ALJ failed to consider the role of those pulmonary findings in Dr. Darr's specific opinion regarding Mr. Petrey's ability to lift and carry over fifteen pounds.  That more narrow argument is addressed below.

### 3.    ALJ Did Not Err in Declining to Adopt Verbatim Consultative Examiner's Fifteen Pound Lifting and Carrying Limitation

As an initial matter, it is noted that that it is imprecise to argue that the ALJ "reject[ed]" Dr. Darr's opinion (ECF Doc. 15, p. 9), as the ALJ clearly explained that she found Dr. Darr's

opinion "somewhat persuasive" (Tr. 34). She expressly considered Dr. Darr's opinion regarding Mr. Petrey's ability to perform manipulative and postural activities in developing the RFC. (Tr. 30.) She also adopted a limitation regarding stair climbing (Tr. 30) consistent with Dr. Darr's opinion that Mr. Petrey "will have a hard time climbing stairs" (Tr. 416).

In fact, the ALJ did not even outright reject Dr. Darr's opinion as to Mr. Petrey's ability to lift and carry. Dr. Darr's exact findings were that Mr. Petrey could lift and carry "between 10 and 15 pounds of weight on a frequent basis and over 15 pounds on occasion." (Tr. 416.) While the ALJ did not adopt those lifting limitations verbatim, she did conclude that Mr. Petrey could perform a reduced range of light work. (Tr. 30.) Under the regulations, light work requires lifting and carrying of up to ten pounds on a "frequent" basis, *see* 20 C.F.R. § 404.1567(b); SSR 83-10, 1983 WL 31251, *5-6 (1983), a limitation that is consistent with Dr. Darr's finding that Mr. Petrey could frequently lift and carry the heavier amount of "between 10 and 15 pounds" (Tr. 416). However, light work also requires occasional lifting and carrying of up to twenty pounds. *See* 20 C.F.R. § 404.1567(b); SSR 83-10, 1983 WL 31251, *5-6 (1983). While this requirement is not *per se* <u>inconsistent</u> with Dr. Darr's finding that Mr. Petrey could lift and carry "<u>over</u> 15 pounds on occasion" (Tr. 416 (emphasis added)), is also not clearly <u>consistent</u> with Dr. Darr's findings, which neither permit nor preclude occasional lifting of twenty pounds. Thus, the question is narrowed to whether the ALJ erred in finding Mr. Petrey could occasionally lift up to twenty pounds, rather than limiting him to occasionally lifting "over 15 pounds."

Mr. Petrey argues that the ALJ failed to properly articulate her finding regarding the persuasiveness of Dr. Darr's fifteen-pound lift and carry limitations under the new regulations. (ECF Doc. 15, pp. 10-11.) On the contrary, it is evident that the ALJ appropriately articulated her analysis in light of the dual considerations of supportability and consistency, as required by

24

the regulations.  Supportability requires consideration of "the objective medical evidence and supporting explanations presented by a medical source … to support his or her medical opinion(s)." 20 C.F.R. § 416.920c(c)(1).  Consistency requires consideration of whether a medical opinion is "consistent … with the evidence from other medical sources and nonmedical sources in the claim." 20 C.F.R. § 416.920c(c)(2).  Here, the ALJ explicitly considered both Dr. Darr's examination findings and other medical evidence in support of her finding that Dr. Darr's opinion as to Mr. Petrey's ability to perform manipulative and postural activities was persuasive.  (Tr. 34 (citing 1F, 3F, 9F).)  In contrast, she found "no support" for the fifteen-pound lifting limitation, reflecting that she did not find explicit support for that lifting limitation in either Dr. Darr's objective findings or in the other medical evidence.  (Tr. 34.)  It is well-settled that the ALJ "is not bound by conclusory statements of doctors, particularly where they are unsupported by detailed objective criteria and documentation." *Buxton v. Halter*, 246 F.3d 762, 773 (6th Cir. 2001) (citation omitted).  The ALJ's articulation of her basis for finding the opinion somewhat persuasive is therefore adequate and compliant with the requirements of the regulations.

More specifically, Mr. Petrey contends that the ALJ erred in finding no support for Dr. Darr's exact lifting limitations because the ALJ impermissibly presumed "that Dr. Darr's opinion was based on Plaintiff's back, arm, and leg pain," when Dr. Darr's opinion as to those specific limitations were "based, not only on his findings related to Plaintiff's gait and lack of tenderness, but on Plaintiff's pulmonary limitations."  (ECF Doc. 15, p. 11.)

Unfortunately, both assumptions in this argument are equally flawed.  First, the record does not clearly demonstrate that the ALJ <u>did not</u> consider Dr. Darr's pulmonary findings in finding there was "no support" for the fifteen-pound lifting limitations.  She explicitly considered his pulmonary findings, and there is no element of the pulmonary findings themselves that

25

clearly requires a finding that Mr. Petrey is able to lift fifteen pounds but not twenty.  Thus, the ALJ's finding that there was "no support" for the specific fifteen-pound limitations is consistent with having considered the pulmonary findings.  Second, the record does not clearly demonstrate that Dr. Darr <u>did</u> consider Mr. Petrey's pulmonary impairments in opining regarding Mr. Petrey's ability to lift and carry.  The consultative examination report documents symptoms, examination findings, x-ray and pulmonary function study results, and Dr. Darr's opinions as to Mr. Petrey's functional limitations, but does not clearly identify which pieces of evidence were considered in determining the lifting limitations.  (Tr. 412-29.)  It cannot be held that an ALJ must examine the basis for a medical opinion more cogently than the medical provider himself.

An examination of both the decision and the underlying record in the case reflects that the ALJ complied with the regulations and was supported by substantial evidence in finding that the record supported lifting and carrying limitations that were slightly less restrictive than those described in Dr. Darr's opinion.  She correctly noted that there was no specific support in the evidence for a limitation to "10 – 15 pounds" (or more accurately "over 15 pounds") (Tr. 34), and instead adopted the opinions of both state agency reviewing physicians that Mr. Petrey was capable of light work.  (Tr. 33-34.)  Both state agency physicians explicitly considered the impact of Mr. Petrey's joint and pulmonary impairments on his residual functional capacity, and specifically considered the findings and opinion of Dr. Darr.  (Tr. 90-92, 106-08.)  The ALJ also appropriately explained that she found the state agency opinions persuasive because they were consistent with the medical evidence of record.  (Tr. 33-34 (citing 1F, 9F).)

The lifting and carrying limitations the ALJ adopted are also consistent with the medical record as a whole, which demonstrated that Mr. Petrey had: nonsevere physical impairments with limited treatment and some medication noncompliance (Tr. 26-27 (citing 1F, 9F)); joint

impairments, but with mostly normal objective findings on examination, limited conservative treatment, and some noncompliance with treatment recommendations (Tr. 31-32 (citing 1F, 3F, 7F, 9F)); and pulmonary impairments, demonstrable with testing and some symptomatic examination findings, but frequently noted to be controlled with medications and largely normal exam findings (Tr. 32-33 (citing 1F, 3F, 5F, 6F, 9F)).

While Mr. Petrey identifies certain evidence that could be supportive of the more restrictive lifting and carrying limitations described by Dr. Darr (ECF Doc. 15, p. 12), it is well-settled that "the Commissioner's decision cannot be overturned if substantial evidence, or even a preponderance of the evidence, supports the claimant's position, so long as substantial evidence also supports the conclusion reached by the ALJ." *Jones v. Comm'r of Soc. Sec*., 336 F.3d 469, 477 (6th Cir. 2003). In this case, it is clear that both the RFC adopted by the ALJ and the ALJ's findings as to the persuasiveness of Dr. Darr's opinion are consistent with the regulations and supported by substantial evidence. This Court's inquiry is therefore at an end.

Accordingly, and or the reasons stated above, the undersigned concludes that the ALJ did not err in declining to adopt the fifteen-pound lifting limitations expressed in the opinion of consultative examiner Dr. Darr, and did not err in explaining her reasons for doing so.

### VII. Recommendation

For the foregoing reasons, the undersigned recommends that the final decision of the Commissioner be AFFIRMED.

December 27, 2021

*/s/Amanda M. Knapp*

AMANDA M. KNAPP
United States Magistrate Judge

**<u>OBJECTIONS</u>**

Any objections to this Report and Recommendation must be filed with the Clerk of Courts within fourteen (14) days after being served with a copy of this document.  Failure to file objections within the specified time may forfeit the right to appeal the District Court's order.  *See Berkshire v. Beauvais*, 928 F.3d 520, 530 (6th Cir. 2019); *see also Thomas v. Arn*, 474 U.S. 140 (1985).